# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| SIMON-MILLS II, LLC, ARUNDEL MILLS MEZZANINE GP, L.L.C., GRAPEVINE MILLS OPERATING COMPANY, L.L.C., and CONCORD MILLS MALL GP, L.L.C., <br><br> Plaintiffs/ Counterclaim Defendants, <br><br> v. <br><br> KAN AM USA XVI LIMITED PARTNERSHIP, KAN AM USA XII LIMITED PARTNERSHIP, KAN AM USA XIV LIMITED PARTNERSHIP, KAN AM USA XIX LIMITED PARTNERSHIP, KAN AM USA XVIII LIMITED PARTNERSHIP, KAN AM USA TIER II LIMITED PARTNERSHIP, and KAN AM USA XV LIMITED PARTNERSHIP, <br><br> Defendants/ Counterclaim Plaintiffs. | ) ) ) ) ) ) ) ) ) ) ) ) ) *Civil Action No. 8520-VCG* ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

## MEMORANDUM OPINION

Date Submitted: June 30, 2014
Date Decided: September 30, 2014

Donald J. Wolfe, Jr., Matthew E. Fischer, Timothy R. Dudderar, J. Matthew Belger, and Jacqueline A. Rogers, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware, Attorneys for the Plaintiffs and Counterclaim Defendants.

Jon E. Abramczyk and Christopher P. Quinn, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; OF COUNSEL: L. Joseph Loveland,

Letitia A. McDonald, Emily S. Newton, and Jordan T. Stringer, of KING & SPALDING LLP, Atlanta, Georgia, Attorneys for the Defendants and Counterclaim Plaintiffs.

GLASSCOCK, Vice Chancellor

The year is 1985. Two sophisticated parties enter a joint venture that allows the first party to exercise a call right ten years in the future, and provides for consideration in Soviet Rubles. The contract further provides that these Rubles must satisfy certain criteria, including that they be the official currency of the Soviet Union. However, when that party attempts to exercise the call right in 1995, the Soviet Union has collapsed and Soviet Rubles, while still physically to be found, are no longer an official currency. Russian Rubles—the official currency of the Russian Federation—are, however, at least according to the party making the call, an appropriate substitute for Soviet Rubles. The second party disagrees, and the contract does not address what to do if and when Soviet Rubles satisfying the characteristics of the contract become unavailable.

The scenario above is a fiction, but the matter before me is strikingly similar. The facts, laid out below, are complicated, but the issues presented are as straightforward as those above: The Plaintiffs seek to specifically enforce a call which provides that the currency to be exchanged for the Defendants' interest is shares in a limited partnership, with the number of shares to be determined by market value. The partnership, however, no longer exists. The Plaintiffs have tendered shares in a successor partnership. The Defendants argue that the contract cannot be specifically enforced because the Plaintiffs cannot tender the consideration bargained for, and that in any event shares in the current partnership

3

are less valuable to it than the shares specified in the contract. The matter is before me on cross-motions for summary judgment. As with any contract, the intent of the parties, as expressed in the contract, controls, and where ambiguities exist, I must resort to extrinsic evidence to determine the parties' intent. Because factual questions remain, the cross-motions for summary judgment must be denied.

## I. FACTS

The Plaintiffs in this matter—Simon-Mills II, LLC; Arundel Mills Mezzanine GP, LLC; Grapevine Mills Operating Company, LLC; and Concord Mills Mall GP, LLC (collectively, the "Simon Parties")—are Delaware limited liability companies either directly or indirectly wholly-owned by Simon Property Group, LP ("Simon Group").[1] Simon Group[2] is a limited partnership that "owns, develops, and manages retail real estate properties."[3]

Simon Group's sole general partner is Simon Property Group, Inc. ("Simon, Inc."), a real estate investment trust ("REIT"), structured as an umbrella partnership real estate investment trust ("UPREIT"). As an UPREIT, all of Simon

---

[1] Simon Aff. ¶ 3; Am. Compl. ¶ 4; Answer ¶ 4.

[2] The names of the many players here are abbreviated in various ways in the numerous documents and pleadings in the record. The parties in briefing settled on acronyms for these entities in a laudable effort to promote clarity. I rarely reject the shortened form of the names of entities chosen by the parties in briefing. I do so here, however, because, I confess, the maze of acronyms overwhelmed the mind of this aging and mildly dyslexic judge. I apologize for any inconvenience the parties may find in analyzing this opinion and its use, in quoting the pleadings, of bracketed matter, but am heartened by the fact that I suspect the reader, like the writer, will find clarity enhanced.

[3] Simon Aff. ¶ 3.

4

Inc.'s assets are owned by Simon Group;[4] Simon, Inc., in turn, owns a majority interest in Simon Group.[5] Simon, Inc. stock trades on the New York Stock Exchange ("NYSE"). Moreover, partnership units of Simon Group ("Simon Group Units") are convertible into cash or the publicly traded stock of Simon, Inc. at the option of Simon, Inc.[6]

The Defendants in this matter are Delaware limited liability companies affiliated with the Kan Am Group ("Kan Am"): Kan Am USA XVI LP; Kan Am USA XII LP; Kan Am USA XIV LP; Kan Am USA XVIII LP; Kan Am USA Tier II LP; and Kan Am USA XV LP (collectively, the "Kan Am Parties"). Through its various real estate funds, Kan Am facilitates global investment opportunities for Germany-based private and institutional investors.[7] Kan Am's holding company, Munich-based Kan Am International GmbH, "direct[s] most of the activities connected with the closed-end Kan Am real estate funds," and is responsible for Kan Am's accounting, data-processing, taxation, personnel, media, and public relations functions.[8]

A. *The JV Limited Partnerships*

---

[4] Foxworthy Aff. ¶ 3.
[5] Simon Aff. ¶ 3.
[6] Foxworthy Aff. ¶¶ 3, 6.
[7] Pls.' Opening Br. in Supp. of Mot. for Summ. J. at 9.
[8] Am. Compl. ¶ 26; Answer ¶ 26.

The Simon and Kan Am Parties, and their affiliates, hold ownership interests in four Delaware limited partnerships relevant to this action, the Orange City Mills Mezzanine II Limited Partnership ("Orange City LP"), Arundel Mills Mezzanine Limited Partnership ("Arundel Mills LP"), Grapevine Mills Limited Partnership ("Grapevine Mills LP"), and Concord Mills Mall Limited Partnership ("Concord Mills LP," and collectively with the Orange City, Arundel Mills, and Grapevine Mills Limited Partnerships, the "JV Limited Partnerships").[9]

The joint venture relationship among Simon, Inc., Kan Am, and their affiliates dates back to the mid-1990s when The Mills Corporation ("Mills Corp."), a "developer, owner, and manager" of a portfolio of retail properties,[10] "approached [Simon, Inc.] about participating in a series of joint ventures for the purpose of developing and owning various shopping centers in metropolitan areas across the United States."[11] Mills Corp., like Simon, Inc., was a REIT structured as a UPREIT; its operating partnership was The Mills Limited Partnership ("Mills Partnership"). Mills Corp. owned a majority of Mills Partnership and also served as its general partner.[12] Mills Corp. common stock was publicly traded on the

---

[9] Hammond Aff. ¶ 3.
[10] Am. Compl. ¶ 23; Answer ¶ 23.
[11] Foxworthy Aff. ¶ 5.
[12] *Id*. ¶ 6; Simon Aff. ¶ 7.

6

NYSE and Mills Partnership units ("Mills Units") were convertible into the publicly traded stock of Mills Corp. or cash, at the option of Mills Corp.[13]

Thereafter, Mills Corp. and Simon, Inc., through affiliates of their respective operating partnerships, and Kan Am, through its various funds, began fostering a business relationship that involved the pursuit of real estate joint ventures.[14] Among the joint ventures developed during the mid- to late-1990s were the Grapevine Mills, Arundel Mills, and Concord Mills Limited Partnerships.[15] Grapevine Mills LP, which was formed in July 1996, was the first joint venture where Simon, Inc., Mills Corp., and Kan Am were all involved at inception; its governing limited partnership agreement was executed in 1996 (the "Grapevine Mills Agreement").[16] The Concord Mills LP was formed and the agreement governing the parties' relationship was executed (the "Concord Mills Agreement") in July 1997.[17] In 1999, the Arundel Mills LP was formed and the agreement governing the parties' relationship was executed (the "Arundel Mills Agreement," and collectively with the Grapevine Mills and Concord Mills Agreements, the

---

[13] Foxworthy Aff. ¶ 6.

[14] *Id.*

[15] Simon Aff. ¶ 8. Simon, Inc. also became involved in projects that Mills Partnership and Kan Am were already pursuing, including the Ontario Mills LP; in 1995, the Ontario Mills LP Agreement was amended and restated in connection with Simon Group's entry. *See, e.g.*, Braithwaite Aff. Ex. A; Braithwaite Aff. ¶¶ 8–9; Foxworthy Aff. ¶ 7. That Agreement is not at issue here.

[16] *See, e.g.*, Braithwaite Aff. Ex. D. at R-1, R-3; Foxworthy Aff. ¶ 7.

[17] *See, e.g.*, Braithwaite Aff. Ex. E. at R-1, R-2.

7

"Original JV Agreements").[18]  In each joint venture project, "the managing general partner . . . was an entity co-owned by [Simon Group] and [Mills Partnership] or their respective affiliates."[19]

Under the Original JV Agreements, involved affiliates of Simon Group and Mills Partnership had a call right, while affiliates of Kan Am received a put right. The buy/sell provisions, however, could not be invoked until the tenth anniversary date of the "Grand Opening," as that term was defined in the Agreements.[20] Essentially, this buy/sell right could not be exercised until ten years after each respective project became operational.  Each year after the initial ten-year period, and upon proper notice during a specified ten-day window, Simon Group- and Mills Partnership-affiliated entities could purchase the interests of the Kan Am affiliates in these partnerships.  If the call right was exercised, the consideration to be paid was Mills Units and Simon Group Units pro rata in proportion to Mills Partnership's and Simon Group's respective interests in the relevant partnership's general partner, unless the Kan Am affiliate opted to receive all cash, or a portion of its interest in cash and the remainder in pro rata Mills Units and Simon Group Units.[21]

---

[18] *See, e.g.*, *id.* Ex. F at R-1, R-2.

[19] Foxworthy Aff. ¶ 6.

[20] *See, e.g.*, Belger Transmittal Aff. Ex. 6 § 11.3(a); *id.* Ex. 7 § 11.3(a); App. to Answer Ex. 6 § 11.3(a).

[21] *See* Belger Transmittal Aff. Ex. 6 § 11.3(d); *id.* Ex. 7 § 11.6(d); App. to Answer Ex. 6 § 11.3(d).

Conversely, the Kan Am-affiliated entities could require affiliates of Simon Group and Mills Partnership to purchase their interests. If a Kan Am entity exercised its put right under the Original JV Agreements, it would receive cash unless the Mills Partnership and Simon Group affiliates elected to pay for its interest entirely in Mills Units and Simon Group Units, in a proportion that Mills Partnership and Simon Group agreed upon, or a combination of cash and an agreed-upon proportion of Mills Units and Simon Group Units.[22]

Under these Agreements, the Mills Units and Simon Group Units were valued at "the gross proceeds which would have been obtained if such units were converted into freely tradeable common stock of Mills Corp. or [Simon, Inc.] as the case may be, and sold at the average closing price of Mills Corp. common stock or [Simon, Inc.] common stock, as the case may be, on the fifteen (15) most recent trading days preceding the date of the Buy/Sell Notice."[23] The Original JV Agreements also outlined the characteristics that Mills Units and Simon Group Units were required to possess. Specifically, these agreements provided that:

> Any [Mills Units] received by [Kan Am] pursuant to this [buy/sell provision] shall have substantially the same rights (including redemption, conversion, registration and anti-dilution protection) as attached to units issued in connection with the formation transactions of [Mills Partnership], as more fully described in the Registration Statement for Mills Corp. dated April 14, 1994 and the exhibits

---

[22] *See, e.g.*, *id.*
[23] Belger Transmittal Aff. Ex. 6 § 11.3(d); *see also id.* Ex. 7 § 11.6(d); App. to Answer Ex. 6 § 11.3(d).

thereto, as amended through the date of this Agreement. Any [Simon Group Units] received by [Kan Am] pursuant to this [buy/sell provision] shall have at least the same rights (including redemption, conversion, registration and anti-dilution protection) as are attached to [Simon Group Units] issued to other limited partners of [Simon Group] as of the date of receipt of the [Simon Group Units] by [Kan Am].[24]

Importantly, because both Mills Corp. and Simon, Inc. were structured as UPREITs, under Section 721 of the Internal Revenue Code, "the contribution of real property or interests in a partnership owning real property to the operating partnership solely in exchange for the operating partnership's units may qualify as a tax-deferred transaction."[25] Consequently, contributions of real property or interests to Mills Partnership or Simon Group in exchange for Mills Units or Simon Group Units, respectively, had the potential to qualify as a tax-deferred transaction.[26] The Original JV Agreements evinced the parties' intent to conduct transactions that qualified for tax deferral under Section 721, providing:

> In the event that [Kan Am] is to receive [Mills Units] and/or [Simon Group Units], then that portion of the transaction shall be cast as a contribution to [Mills Partnership] and [Simon Group], ratably in accordance with the value of units received from each, of that portion of [Kan Am's] Entire Interest which is being exchanged for [Mills Units] and/or [Simon Group Units], and *is intended to be a tax-free transaction under Section 721 of the Code.*[27]

---

[24] Belger Transmittal Aff. Ex. 7 § 11.3(f); *see also id.* Ex. 6 § 11.3(f); App. to Answer Ex. 6 § 11.3(f).

[25] Simon Aff. ¶ 5; Sokolov Aff. ¶ 5; *see also* Foxworthy Aff. ¶ 14.

[26] Simon Aff. ¶ 7; Sokolov Aff. ¶ 7.

[27] Belger Transmittal Aff. Ex. 6 § 11.3(d) (emphasis added); *see also id.* Ex. 7 § 11.3(d); App. to Answer Ex. 6 § 11.3(d).

The Plaintiffs also contend that the parties intended the buy/sell provisions to serve as a dispute resolution mechanism.[28] The Defendants dispute this contention.[29]

In 2002, Simon, Inc., pursuant to a separate buy/sell arrangement with Mills Corp., "offer[ed] to either sell [its] interests in the relevant joint ventures [including the four at issue here] or buy [Mills Corp.'s] interests in the relevant joint ventures at a stated price."[30] This would mean that either Simon, Inc. or Mills would be exiting the joint partnership, and consequently, that either Simon Group Units or Mills Units, both of which served as buy/sell consideration under the relevant limited partnership agreements, would be rendered unavailable.

On March 4, 2002, Kan Am executive James Braithwaite sent a letter to Simon, Inc.'s CEO, David Simon, and Mills Corp.'s CEO, Laurence Siegel, communicating that:

> The Partnership Agreement for Ontario Mills calls for the purchase price for Kan Am's interests to be paid in units of limited partnership in [Mills Corp.] or [Simon, Inc.] in certain circumstances. We would be interested in discussing with you how [the buy/sell provision] of the Ontario Mills Agreement might be implemented if there has been

---

[28] *See, e.g.*, Pls.' Opening Br. In Support of Mot. for Summ. J. at 36–37; Pls.' Answering Br. in Opp'n to Defs.' Mot. for Summ. J. at 28–29 ("In the Proxy disclosures provided to Mills stockholders in connection with a vote to approve Mills pursuing joint ventures with Kan Am, Mills noted a concern that 'Kan Am will have significant consent rights' in the joint ventures, but assured its stockholders that it 'will have the right to acquire Kan Am's interest for appraised value once the project is mature allowing it to eliminate Kan Am's consent rights if they are a problem.'").

[29] *See, e.g.*, Hammond Aff. ¶¶ 35–38.

[30] Simon Aff. ¶ 14; *see also* Foxworthy Aff. ¶ 17.

a buy/sell between [Mills Corp.] and [Simon, Inc.] of your interests in Ontario Mills, L.L.C.[31]

At the time, if the Simon Group- or Mills Partnership-affiliates were to exercise their call rights under the Ontario Mills LP Agreement, the Kan Am affiliates were to receive two-thirds of their interest in Mills Units and one-third in Simon Group Units, unless they elected to receive cash.[32]  On March 5, Simon responded that:

> With respect to your question on Ontario, the only impact of our buy/sell with [Mills Corp.] would be that if the buyer between us later decided to call your interest, you would have the right to request OP [Operating Partnership] Units of that entity or cash.  If you put your interest, it is the acquirer that elects whether to use cash or its OP Units.  In either case, the OP units would be of whichever of [Mills Corp.] or [Simon, Inc.] was your partner.[33]

Braithwaite did not respond to Simon.

In 2002, Simon, Inc. sold its interest to Mills Corp.[34]  Thereafter, Mills Corp. continued to operate real estate joint ventures with Kan Am.  On May 31, 2002, following Simon, Inc.'s exit, the Original JV Agreements were amended to remove all references to Simon, Inc. and its affiliates.[35]  The amendment to the Grapevine Mills Limited Partnership Agreement, for example, included the following provision:

---

[31] Foxworthy Aff. Ex. A; *see also* Simon Aff. ¶ 15.
[32] *See* Braithwaite Aff. Ex. B § 11.3(d).
[33] Simon Aff. Ex. B; *see also id.* ¶ 16.
[34] *See, e.g.*, Braithwaite Aff. Ex. C at R-6.
[35] *See, e.g.*, *id.* ¶ 14.

12

> References to "[Simon Group]" or its Affiliates in the Partnership Agreement are hereby deleted to the extent no longer operative following transfer of the Simon Interest. References to "[Simon Group]" or its Affiliates in the Partnership Agreement that pertain to rights or obligations of [Simon Group] or its Affiliates that survive the transfer of the Simon Interest shall be deemed to be references to [Mills Partnership], Kan Am XV and Kan Am XXI, severally, in their respective capacities as transferees of the Simon Interest, in accordance with their Allocable Percentages.[36]

The agreements governing the Arundel Mills and Concord Mills Limited Partnerships contained similar provisions.[37]

Orange City LP, the fourth partnership involved here, was formed in February 2004—that is, after Simon, Inc. had exited the partnership—as part of the reorganization of the Orange City Mills Mezzanine LP.[38] The governing partnership agreement was executed in 2004 (the "Orange City Agreement," and collectively with the Original JV Agreements, the "JV Agreements"). Like the Original JV Agreements, the Orange City Agreement also contains a buy/sell provision whereby the default consideration for a call is Mills Units.[39] Unlike the Original JV Agreements, however, Section 11.2(a) of the Orange City Agreement provides that "for purposes of this Section 11.2 and Section 11.3 [the buy/sell provisions] [Mills Partnership] shall be deemed to include [Orange City Mills

---

[36] *See id.* Ex. D § 2(e).
[37] *See id.*; *id.* Ex. E § 2(h); *id.* Ex. F § 2(e).
[38] Belger Transmittal Aff. Ex. 23 at KANAM_00001178.
[39] *See* Quinn Transmittal Aff. Ex. 16 § 11.3(d) ("If [Mills Partnership] is the Offeror pursuant to Section 11.3(b) . . . and unless [Kan Am] elects to receive cash, the Buy/Sell Price shall be paid in full in [Mills Units].").

13

Mezzanine II GP, LLC] and any other Mills Partners."[40] The term Mills Partners is defined as "[c]ollectively, [Mills Partnership] and [Orange City Mills Mezzanine II GP, LLC] and their respective Affiliates, successors and/or assigns who or which become Partners in accordance with this Agreement."[41]

B. *Trouble at Mills Corp.*

In early 2005, Mills Corp. began to experience accounting and liquidity issues. Mills Corp. disclosed that, due to accounting errors, it needed to restate financial results for 2000 through 2004.[42] Thereafter, the SEC began an inquiry into Mills Corp.'s accounting practices and, in March 2006, launched a formal investigation.[43] Around this time, the deadlines for repaying approximately $2 billion in debt were also approaching, and Mills Corp.'s "auditor believed that there was 'substantial doubt' that Mills Corp. could stay in business because of [these] looming deadlines."[44]

On March 17, 2006, Mills Corp. announced that it would be filing its 2005 annual report late.[45] Mills Corp., in fact, never filed this 10-K nor any subsequent

---

[40] Quinn Transmittal Aff. Ex. 16 § 11.2(a).
[41] *Id.* § 1.39; *see also id.* § 1.2 (defining Affiliate, "[w]ith respect to any Person, a Person who, directly or indirectly, controls, is under common control with, or is controlled by, that Person," with control meaning "the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person").
[42] Am. Compl. ¶¶ 27–28.
[43] *Id.* ¶ 28.
[44] *Id.* ¶ 29.
[45] *Id.*

14

quarterly or annual reports, following its 10-Q for the third quarter of 2005.[46]  As a result, Mills Corp. became unable to "register any common stock and therefore could not provide stock in the event holders of [Mills Units] sought conversion."[47]

Between October 2005 and January 2007, as these accounting and liquidity issues were unfolding, Mills Corp. common stock "los[t] over half of its market value."[48]  In February 2007, Mills Corp. entered into an agreement with SPG-FCM Ventures, LLC ("SPG Ventures"), whereby SPG Ventures would acquire Mills Corp. for approximately $7.9 billion (the "Merger Agreement").  SPG Ventures was a joint venture between a Simon Group subsidiary and funds managed by Farallon Capital Management, LLC (collectively, "Farallon").[49]  The Simon Group subsidiary and Farallon each held a 50% interest in SPG Ventures.

Pursuant to the Merger Agreement, a tender offer was conducted; thereafter, a subsidiary of SPG Ventures merged into Mills Partnership, with Mills Partnership surviving.  As a result of this transaction, holders of Mills Units generally received $25.25 in cash, while certain holders received the option of exchanging these Units for Simon Group Units.  Holders of 319,022 Mills Units took advantage of this option.[50]

---

[46] Sokolov Aff. ¶ 10.
[47] Pls.' Opening Br. in Supp. of Mot. for Summ. J. at 17; *see also* Belger Transmittal Aff. Ex. 19.
[48] Sokolov Aff. ¶ 10; Am. Compl. ¶ 30; Answer ¶ 30.
[49] Sokolov Aff. ¶ 10.
[50] Further, at the time, German investors of Kan Am held approximately 4.5 million Mills Units. In connection with the merger, approximately 180 of these investors—each holding over 5,000

15

As a result of this merger, Simon Group "acquired a 50% indirect ownership interest in [Mills Partnership], and thereby acquired an indirect ownership interest in a number of joint venture projects between affiliates of [Mills Partnership] and Kan Am, including the JV Limited Partnerships."[51] Mills Corp. was dissolved on August 1, 2007.[52]

C. *The Unavailability of Mills Units*

Following Mills Corp.'s dissolution, Mills Units no longer satisfied the requirements under the buy/call provisions of the JV Agreements—because Mills Corp. had been dissolved, Mills Units were no longer convertible into Mills Corp. common stock.[53] Though Simon Group Units were convertible into Simon, Inc.

---

Mills Units—had the option of receiving cash or converting their Units into Simon Group Units. Only four investors, holding 45,000 Mills Units collectively, opted to receive Simon Group Units. Hammond Aff. ¶ 11. Further, only one Kan Am principal chose to convert any Mills Units into Simon Group Units, and "Kan Am entities that together owned more than 500,000 Mills Units all chose to sell for cash . . . rather than take [Simon Group Units]." *Id.* ¶¶ 12–13.

[51] Sokolov Aff. ¶ 11.

[52] *Id.*

[53] Though the JV Agreements contain "Change in Control" provisions, these do not address the type of Units to replace Mills Units, if made unavailable. *See, e.g.*, Quinn Transmittal Aff. Ex. 5 § 11.6(a) ("Commencing May 1, 2011 and each and every May 1st thereafter during the term of the Partnership . . . or, if earlier, upon the occurrence of a Change of Control Transaction, either [Kan Am] or [Arundel Mills Mezzanine GP, LLC] (the "Offeror") may give Notice in accordance with this Section 11.6 (the 'Buy/Sell Notice') to the other . . . ."); *id.* Ex. 12 § 13(d) ("Section 11.3(a) [of the Grapevine Mills Agreement] is hereby amended to read in its entirety as follows: . . . Commencing May 1, 2008 and each and every May 1st thereafter during the term of the Partnership . . . or, if earlier, upon the occurrence of a Change in Control Transaction, either [Kan Am] or Mills (the 'Offeror') may give Notice in accordance with this Section 11.3 (the 'Buy/Sell Notice') to the other . . . ."); *id.* Ex. 5 § 1.16 (defining the term "Change in Control Transaction"). The Plaintiffs argue that the operation of these Change in Control provisions, however, conflicts with the Defendants' interpretation of the buy/sell provision, since this call right would be illusory upon a change of control under Defendants' reasoning. *See, e.g.*, Pls.' Answering Br. in Opp'n to Defs.' Mot. for Summ. J. at 18–19.

16

common stock, thus preserving the applicability of Section 721 to qualifying transactions, Farallon was a private entity for which this feature was unavailable. The buy/sell provisions of the JV Agreements, however, were not updated to reflect the unavailability of Mills Units, nor did the parties amend these Agreements to indicate the appropriate buy/sell consideration now that Mills Units were unavailable.[54] Nonetheless, the Plaintiffs contend that, after the 2007 merger and Mills Corp.'s dissolution, the Defendants continued to contemplate that the buy/sell provisions remained in effect, and that Simon Group Units were the appropriate—and in fact automatic—substitute for Mills Units.

### 1. Kan Am Audited Financial Statements

Among other indications of Kan Am's intent, the Plaintiffs point to several statements contained in Kan Am's audited financial statements. For instance, in 2007, after the merger and Mills Corp.'s dissolution, Kan Am represented that "[t]here was no impact on the Partnership[s] related to the acquisition."[55] In subsequent audited financial statements, moreover, Kan Am recognized that the relevant Kan Am entities "have agreements that at certain dates and under certain conditions may require the sale of the [Kan Am] Partnership's interest to [Mills

---

[54] The parties did amend the Arundel Mills Agreement, and delete the term "Mills. Corp." from the definitional section of that Agreement, because that term was "no longer required." Quinn Transmittal Aff. Ex. 6 § 3. This amendment, however, did not make any explicit changes to the buy/sell provisions.

[55] Belger Transmittal Aff. Ex. 23 at KANAM_00001178.

17

Partnership] at fair market value, as defined, at the date of such sale."[56]  In its June 25, 2013 audited financial statement for Kan AM USA XII LP, one of the Defendants here, Kan Am noted that "[t]he limited partnership agreements of The Outlets at Orange Entities have provisions that may require the sale of the Partnership's interests . . . at a price based upon the fair market value of the Project as determined by third-party appraisers, for (at the Partnership's option) either cash or [Mills Units]."[57]  This statement also discloses that "[t]he Partnership has challenged Simon's ability to perform under the limited partnership agreements."[58]

### 2. The Denver West Negotiations

Additionally, the Plaintiffs contend that the negotiation of the Denver West joint venture is illustrative of the parties' intent with respect to the four limited partnership agreements at issue here.  Following the 2007 merger and Mills Corp.'s dissolution, the parties negotiated the Mills Corp.-Kan Am Denver West LP Agreement (the "Denver West Agreement").[59]  This Agreement was based on the terms of the Mills-Kan Am Colorado Mills LP Agreement (the "Colorado Agreement"), which contained similar terms to the JV Agreements at issue here.[60]

---

[56] *Id.* Ex. 24 at KANAM_00001564; *see also id.* Ex. 25 at KANAM_00000783; *id.* Ex. 26 at KANAM_00001148; *id.* Ex. 27 at KANAM_00001582.
[57] *Id.* Ex. 29 at KANAM_00000803.
[58] *Id.*
[59] Hammond Aff. ¶ 17.
[60] *Id.* ¶ 19.

On September 23, 2007, Melissa Breeden, Senior Staff Attorney for Simon, Inc., sent an email to representatives of Kan Am, stating that, "Simon and Farallon would like the Buy/Sell Price to be paid in cash only, since upon the dissolution of Mills Corp. payment in [Mills Units] no longer works."[61] She attached to this email a draft version of the Agreement that contained solely cash as buy/sell consideration.[62] Kan Am, on the other hand, wanted to retain the right, in connection with the Denver West Agreement, "to receive some form of non-cash consideration."[63] Simon, Inc. General Counsel and Secretary, James M. Barkley, who was involved in the Denver West negotiations, relayed in his affidavit that:

> Despite the unavailability of [Mills Units] convertible into [Mills Corp.] common stock at the time the Denver West JV Agreement was negotiated, during the negotiations, representatives of Kan Am took the position that the Buy/Sell Provisions of the Denver West JV Agreement should, consistent with the JV Agreements, continue to reference payment of the Buy/Sell Price in [Mills Units]. During these negotiations, Kan Am took the position that, as the successor to [Mills Partnership], [Simon Group] had successor liability under the Buy/Sell Provisions such that [Simon Group] would have to provide its operating partnership units in situations where [Mills Units] would otherwise have been required to pay all or a portion of the Buy/Sell Price. My understanding was that Kan Am's request to include references to [Mills Units] in the Buy/Sell Provisions of the Denver

---

[61] *Id.* ¶ 24; *id.* Ex. A at KANAM_00015487.

[62] *Id.* ¶ 24; *id.* Ex. A at KANAM_00015487, KANAM_00015531–34.

[63] *Id.* ¶ 25; *see also* Breeden Aff. ¶ 9 ("Recognizing that [Mills Units] convertible into [Mills Corp.] common stock were no longer available, [Simon, Inc.] proposed that all references to [Mills Units] be removed and that the Denver West JV Agreement provide for payment of the Buy/Sell Price exclusively in cash. In response, James Braithwaite, on behalf of Kan Am, requested that the Denver West JV Agreement include reference to payment of the Buy/Sell Price in [Mills Units], even though [Mills Units] convertible into [Mills Corp.] common stock were no longer available.").

West JV Agreement was an attempt to preserve Kan Am's right to receive the Buy/Sell Price in [Simon Group Units].[64]

Ultimately, the parties agreed that, for Denver West, cash would be the sole buy/sell consideration. Nevertheless, Simon, Inc., Farallon, and Kan Am executed a Unifying Side Letter for this project on October 17, 2007. During negotiations of this Letter, Kan Am proposed the following language:

> [Mills Corp.] and Kan Am acknowledge that the non-triggering party under the Buy/Sell provision of the [Colorado Agreement] may chose either cash or units of limited partnership interest in [Mills Partnership] ("[Mills Units]") or a combination of both as payment for the sale of Kan Am's Entire Interest. The [Colorado Agreement] contemplates that any payment in [Mills Units] would be valued at the gross proceeds obtained if such units were converted into freely tradable common stock of the Mills Corporation ("Mills Corp."). *In light of the dissolution of the Mills Corp., Mills and Kan Am agree to negotiate in good faith a new valuation for the [Mills Units] that shall entail a conversion into the common stock of [Simon, Inc.], or an affiliated corporate entity approved by Kan Am.*[65]

Neither Simon nor Farallon, however, approved of this language.[66] Six days later, Kan Am principal Kent Hammond emailed another draft to Brian Warnock of Simon, Inc., which acknowledged that:

---

[64] Barkley Aff. ¶ 7; *see also id.* ¶ 8 ("During negotiations of the Denver West JV Agreement, I do not recall Kan Am ever expressing that including references to payment of the Buy/Sell Price in [Mills Units] would result in the right to call Kan Am's interest under the Buy/Sell Provisions being unexercisable, and neither Kan Am nor Kan Am's counsel ever communicated such a position to me, or to my knowledge, anyone at [Simon Group], during the negotiations.").

[65] Hammond Aff. Ex. B. at KANAM_00021887 § 1(G) (emphasis added); *see also* Hammond Aff. ¶ 26.

[66] *Id.* ¶ 26.

> [I]n light of the acquisition of the Mills Corporation and [Mills Partnership] (collectively, "Mills"), *there is a disagreement as to the form of the non-cash consideration under [the buy/sell provisions] of the Denver West Agreement as well as the Limited Partnership Agreements,* i.e*., whether the units are to be units of [Simon Group] instead of [Mills Units] as a result of the acquisition of Mills.* The parties hereby further acknowledge that, by execution of the Denver West Agreement, Kan Am has not waived any of its rights or claims as to the form of non-cash consideration under [the buy/sell provision] of any of the Limited Partnership Agreements or the Denver West Agreement.[67]

The language regarding the parties' "disagreement as to the form of the non-cash consideration under [the buy/sell provisions] of the Denver West Agreement as well as the Limited Partnership Agreements" was not included in the final version, however. The executed Unifying Side Letter instead provides:

> Notwithstanding Paragraph 3 hereof, and without waiver of any rights that the parties may have regarding the construction of [the buy/sell provision] of the [Colorado Agreement], [the buy/sell provision] of the [Denver West Agreement] provides that cash shall be the sole form of payment in the event the buy/sell provisions . . . are exercised by either Partner. MLLC, Mills Partnership, Denver West Development Company, LLC and Kan Am XX agree that, *if the parties agree, or it is later determined, that non-cash consideration may be paid under the payment provisions of [the buy/sell provision] of the [Colorado Agreement], then [the buy/sell provision] of the [Denver West Agreement] shall also be modified to reflect such payment provisions.*[68]

---

[67] *Id.* Ex. C at KANAM_00017559 (emphasis added); *see also* Hammond Aff. ¶ 27.
[68] Quinn Transmittal Aff. Ex. 2 at 9 (emphasis added). The buy/sell provision of the Colorado Agreement, which provided for [Mills Units] as buy/sell consideration, was never amended. *See, e.g.*, Hammond Aff. ¶¶ 29–30.

21

In her Affidavit, Breeden expressed that she "understood at the time that the reference to 'non-cash consideration' in the Unifying Side Letter was intended to refer to limited partnership units of [Simon Group]."[69]

### 3. Refinancing of Grapevine Mills LP

In 2008, the Grapevine Mills LP was refinanced. At that time, Simon, Inc. sought to amend the buy/sell provisions of the Grapevine Mills Agreement such that cash was the sole buy/sell consideration.[70] Kan Am was not amenable to this proposal, and no amendment was made.[71]

### 4. Kan Am Considers Exercising Put Rights

David Simon testified that, in March 2009, "Dietrich von Boetticher, a principal of Kan Am and its affiliated entities, called [him] and explained that Kan Am would like to sell its interest in various joint ventures between [Simon Group] and Kan Am, including the JV Limited Partnerships, to [Simon, Inc.] in exchange for [Simon Group Units]."[72] Simon later sent an email to others at Simon, Inc., stating "I got a call from [von Boetticher]. He would like to sell his Kan Am positions to us for units."[73]

---

[69] Breeden Aff. ¶ 11.
[70] Hammond Aff. ¶ 32; *id.* Ex. E at KANAM_00015631–32, 34–35.
[71] *Id.* ¶ 33.
[72] Simon Aff. ¶ 20.
[73] Belger Transmittal Aff. Ex. 37.

In September 2009, Gregg Goodman, President of Mills Partnership, traveled to Germany to conduct a presentation for a group of Kan Am investors and sales representatives, and to meet with von Boetticher and Franz von Perfall.[74] During lunch one day, von Boetticher

> expressed to [Goodman] a strong desire to find an exit strategy for Kan Am from the joint venture partnerships between affiliates of [Simon Group] and Kan Am, including the JV Limited Partnerships. Mr. von Boetticher indicated that such an exit strategy would involve an exchange of Kan Am's ownership interests in the joint venture partnership for equity interests in [Simon, Inc.]. Mr. von Boetticher stated that he had previously spoken with David Simon, Chief Executive Officer and Chairmen of the Board of [Simon, Inc.], about selling Kan Am's position in joint ventures between [Simon Group] and Kan Am, including the JV Limited Partnerships, in exchange for [Simon, Inc.] equity, and he asked that I convey his continued interest in such an exchange to David Simon.[75]

Following his trip, Goodman sent an email to David Simon and Richard Sokolov—Simon, Inc. President, Chief Operating Officer, and director—which conveyed von Boetticher's "strong desire to find an exit strategy from their project ownership," and noting that "he said he had spoken with you in the past about converting their ownership into shares in [Simon, Inc.]."[76]

---

[74] Goodman Aff. ¶ 7.
[75] *Id.*
[76] Belger Transmittal Aff. Ex. 38. The Plaintiffs also rely on a communication between Kan Am and a Farallon executive, Rocky Fried, in which Fried conveys that Kan Am "a put, no call. They can exercise the put on May 1st. It sounds like they want [Simon, Inc.] stock." Belger Transmittal Aff. Ex. 39. According to the Plaintiffs, this evidences Kan Am's "desire to receive [Simon, Inc.] equity in the event the call right was exercised." Pls.' Opening Br. in Supp. of Mot. for Summ. J. at 24. The Defendants, however, contend that this email is unrelated to the dispute before me. *See, e.g.*, Braithwaite Aff. ¶ 15.

Additionally, Kan Am held three meetings where executives discussed the impact of the 2007 merger, including "the units that would be available upon Kan Am's exit from the joint ventures," with its investors and distributors: an October 2007 meeting in Dusseldorf, Germany, and September 2009 and August 2010 meetings in Munich.[77] Norbert Geisen, who brokers investments in various Kan Am funds, attended these meetings, and explained that:

> On several occasions during these meetings, I recall Kan Am executives, including Dietrich von Boetticher and Michael Birnbaum, stating that, because [Mills Units] were no longer available following the acquisition of [Mills Corp.] and [Mills Partnership], if Kan Am were to exit the joint ventures pursuant to the Buy/Sell Provisions of the JV Agreements, Kan Am would be able and free to choose to receive operating partnership units of [Simon Group], in lieu of [Mills Units]. Messrs. von Boetticher and Birnbaum stated that [Simon Group Units] would provide Kan Am and its investors with the same tax advantages as [Mills Units].[78]

Kan Am investors Joerg Dudel, who attended all three meetings, and Reiner Michael Cramer, who attended the 2007 meeting in Dusseldorf, had similar recollections.[79]

D. *The 2012 Agreement and Indemnity, and the 2012 Letter Agreements*

In 2012, affiliates of Simon, Inc. acquired Farallon's interest in certain Mills Partnership assets, including Mills Partnership's interest in the JV Limited

---

[77] Geisen Declaration ¶ 6.

[78] *Id.* ¶ 7.

[79] *See, e.g.*, Dudel Declaration ¶ 8; Cramer Declaration ¶ 6.

Partnerships.[80]  As a result, "Farallon retained only a small indirect capital interest in Simon Mills."[81]  Following Farallon's exit, in March 2012, Simon Group and Kan Am signed an Agreement and Indemnity, with Simon Group as the Indemnitor and various Kan Am parties as the Indemnities.  Under that Agreement, these Kan Am parties consented to the transaction between Simon, Inc. and Farallon, as well as the subsequent restructuring of Mills Partnership, while Simon Group agreed to indemnify these parties for claims arising out of these transactions.  This Agreement provides that the

> Indemnities agree that any of [the Simon Group]-affiliated entities which are the transferees upon the Closing of the Transaction will be admitted as partners and/or members, as the case may be, of the applicable entities which own any of the [Simon Group]/Kan Am Properties, without any further act or agreement required.[82]

The parties further stipulated that "[t]his Agreement shall not be construed as a modification of such organizational documents, nor be construed to diminish, enlarge or in any way affect such rights, if any, which, to the extent such rights exist, shall remain in full force and effect in accordance with their terms."[83]

---

[80] Am. Compl. ¶ 38 ("As part of these transactions, [Mills Partnership] transferred certain assets, including its interests in or with respect to the JV Limited Partnerships, to Simon-Mills II, LLC and Simon-Mills III, LLC . . ., entities that were wholly owned subsidiaries of [Mills Partnership].  Through certain additional transactions, affiliates of [Simon, Inc.] acquired Farallon's interest in Simon Mills."); Countercl. ¶ 4; Answer to Countercl. ¶ 4.

[81] Am. Compl. ¶ 38; Countercl. ¶ 4.

[82] Quinn Transmittal Aff. Ex. 21 § 1(b).

[83] *Id.* § 1(d).

By late April 2012, and after the execution of this Agreement and Indemnity, certain disagreements had arisen between Kan Am and Simon, Inc.[84] With the ten-day window in which those affiliates could exercise their buy/sell rights quickly approaching, Simon, Inc. was contemplating whether to buy out all or a substantial portion of Kan Am's interest.[85] On April 26, 2012, at a meeting between Kan Am and Simon, Inc. representatives, Kan Am communicated that they did not want Simon, Inc. to exercise its call rights.[86] Thereafter, the parties continued to negotiate their disagreements and, in early May 2012, affiliates of Simon Group and Kan Am executed a letter agreement that provided:

> We have agreed that notwithstanding anything in the Partnership Agreements or Omnibus Amendment to the contrary, for the 2012 calendar year only, either Simon or Kan Am may elect to be an Offeror and deliver a Buy/Sell Notice to the Offeree within ten (10) days from and after June 1, 2012 (but not before June 1, 2012), as opposed to the ten (10) day period currently specified in the Partnership Agreements commencing May 1, 2012.[87]

In early June 2012, a second letter agreement was executed, which extended the election period to June 19, 2012.[88] The parties, however, reached a resolution, and no affiliates of Simon Group exercised their call rights at that time.[89]

E. *The Simon Parties Seek to Exercise Their Call Rights*

---

[84] *See, e.g.*, Sokolov Aff. ¶¶ 15–16.
[85] *Id.* ¶ 16.
[86] *Id.* ¶ 15.
[87] Belger Transmittal Aff. Ex. 40 at SIMON00009554; *see also* Simon Aff. ¶ 26; Sokolov ¶ 18.
[88] *See, e.g.*, Belger Transmittal Aff. Ex. 41 at SIMON00009561.
[89] Sokolov Aff. ¶ 20.

In their current iteration, the buy/sell provisions of the four JV Agreements at issue provide that each year, from May 1 and within ten days thereafter, a party may give notice that it is exercising its rights under that provision. If the call right is exercised under the Arundel Mills, Grapevine Mills, and Concord Mills LP Agreements, the consideration to be provided is Mills Units unless the relevant Kan Am entity elects to receive all or part of its interest in cash.[90] Under the Orange City Agreement, Mills Units are the proper consideration unless the Kan Am affiliate elects to receive the value of its entire interest in cash.[91] Conversely, if a Kan Am entity exercises its put right, the buy/sell consideration is cash unless the Simon Group affiliate opts to pay entirely or partially in Mills Units.[92]

> As buy/sell consideration, these Mills Units were to be valued
>
> at the gross proceeds which would have been obtained if such common units were converted into freely tradeable common stock of Mills Corp., and sold at the average closing price of Mills Corp. common stock, on the fifteen (15) most recent trading days preceding the date of the Buy/Sell Notice.[93]

Likewise, they are to

---

[90] *See, e.g.*, Quinn Transmittal Aff. Ex. 5 § 11.6(d) ("[T]he Buy/Sell Price shall be paid in full in common units of limited partnership in [Mills Partnership] ("[Mills Units]"), unless [Kan Am] elects to receive either (A) one hundred percent (100%) of the Buy/Sell Price in cash or (B) a portion of the Buy/Sell Price in [Mills Units] and the remainder of the Buy/Sell Price in cash."); *id.* Ex. 7 § 11.3(d); *id.* Ex. 10 § 11.3(d). *See generally id.* Exs. 7–15.

[91] *Id.* Ex. 16 § 11.3(d).

[92] *See* Quinn Transmittal Aff. Ex. 5 § 11.6(d); *id.* Ex. 7 § 11.3(d); *id.* Ex. 10 § 11.3(d); *id.* Ex. 16 § 11.3(d).

[93] *Id.* Ex. 5 § 11.6(d); *see also id.* Ex. 7 § 11.3(d); *id.* Ex. 10 § 11.3(d); *id.* Ex. 16 § 11.3(d).

have substantially the same rights (including redemption, conversion, registration and anti-dilution protection) as attached to units issued in connection with the formation transactions of [Mills Partnership] and Mills Corp., as more fully described in the Registration Statement for Mills Corp. dated April 14, 1994 and the exhibits thereto, as amended through the date of this Agreement.[94]

Further,

[i]n the event that the owners of the [Kan Am] Entire Interest are to receive [Mills Units], then that portion of the transaction shall be cast as a contribution to Mills Partnership, of that portion of [Kan Am's] Entire Interest which is being exchanged for [Mills Units], and is intended to be a tax-free transaction under Section 721 of the Code.[95]

Additionally, the buy/sell provisions under the JV Agreements provide that,

if at the time of Closing, either party fails to perform as required, then in such event the non-breaching party shall have the right to void the Buy/Sell Notice attributable thereto or to pursue any rights at law or in equity (including without limitation, instituting a suit for specific performance).[96]

On April 16, 2013, following a meeting at which the buy/sell provisions were discussed, Braithwaite sent a letter to David Simon expressing that no units except Mills Units were acceptable to Kan Am.[97] In this letter, Braithwaite conveyed that, "[l]ast year, I expressed our willingness to Steve to negotiate possible amendments to the put-call provisions, and I reiterated that willingness to you in our recent meeting on the 15th of April."[98]

---

[94] *Id.* Ex. 5 § 11.6(f); *see also id.* Ex. 7 § 11.3(f); *id.* Ex. 10 § 11.3(f); *id.* Ex. 16 § 11.3(f).
[95] *Id.* Ex. 5 § 11.6(d); *see also id.* Ex. 7 § 11.3(d); *id.* Ex. 10 § 11.3(d); *id.* Ex. 16 § 11.3(d).
[96] *Id.* Ex. 5 § 11.6(e); *see also id.* Ex. 7 § 11.3(e); *id.* Ex. 10 § 11.3(e); *id.* Ex. 16 § 11.3(e).
[97] Belger Transmittal Aff. Ex. 43 at SIMON00000210.
[98] *Id.* at SIMON00000211.

28

On May 2, 2013, Plaintiffs Simon-Mills II, LLC; Grapevine Mills Operating Company, LLC; and Arundel Mills Mezzanine GP, LLC provided notice that they were exercising their call rights under the Orange City LP, Grapevine Mills LP, and Arundel Mills LP Agreements, respectively. On May 6, the affiliated Defendants disputed the validity of the Plaintiffs' exercises of their call rights.

On May 13, 2013, Plaintiff Concord Mills Mall GP, LLC provided notice under Concord Mills LP Agreement that it was exercising its call right. On May 13, 2013, the affiliated Defendants disputed the validity of this exercise, as well as the timeliness of the notice by Concord Mills Mall GP, LLC.

Because of the unavailability of Mills Units, the Plaintiffs were prepared to provide Simon Group Units, unless the relevant Kan Am entities elected to receive cash. The Defendants, however, contend that the Plaintiffs cannot comply with their contractual obligation of providing Mills Units, and have breached the JV Agreements.[99]

## II. PROCEDURAL HISTORY

On May 2, 2013, the Plaintiffs filed their Verified Complaint, subsequently amended, seeking declaratory relief and specific performance of the buy/sell provisions under the JV Agreements.[100] On June 10, the Defendants filed their

---

[99] Without waiving any of their rights, the Defendants have agreed to participate in the appraisal process contemplated under the buy/sell provisions of the JV Agreements.
[100] Am. Compl. ¶ 3.

Answer and a Verified Counterclaim for breach of contract, alleging that the Plaintiffs' inability to provide Mills Units as specified in the JV Agreements renders their notice invalid, and that "[t]he failure of the [Plaintiffs] to provide valid Buy/Sell Notices consistent with the provisions of the JV Agreements represents a breach of the Buy/Sell provisions in the JV Agreements."[101] Additionally, the Defendants argue that the May 13, 2013 notice of Plaintiff Concord Mills Mall GP, LLC was untimely.

On June 18, 2013, Kan Am filed a Motion for Judgment on the Pleadings, for which I heard oral argument on September 24, 2013. At the conclusion of argument, I reserved decision on Kan Am's Motion and requested that the parties pursue limited discovery on two discrete issues: first, whether there are material differences between Mills Units and Simon Group Units, and second, whether the 2012 Indemnification Agreement substitutes Simon, Inc. and Simon Group Units for Mills Corp. and Mills Units under the JV Agreements.[102]

On December 9, 2013, the Defendants filed a Motion to Terminate Discovery and Renew Their Motion for Judgment on the Pleadings. After briefing and telephonic oral argument, I denied this Motion. On March 28, 2014, the parties cross-moved for summary judgment. I heard oral argument on the parties' Cross-Motions on June 30, 2014. For the following reasons, I deny both Motions.

---

[101] Countercl. ¶¶ 41–42.
[102] Sept. 24, 2013 Oral Arg. Tr. 80:1–81:5.

## III. STANDARD OF REVIEW

The parties have cross-moved for summary judgment pursuant to Court of Chancery Rule 56(c). A motion for summary judgment will be granted "where the record reflects that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[103] When addressing a motion for summary judgment, "the facts must be viewed in the light most favorable to the nonmoving party and the moving party has the burden of demonstrating that there is no material question of fact."[104] At this juncture, "the court cannot weigh the evidence, decide among competing inferences, or make factual findings."[105]

When addressing cross-motions for summary judgment, I must examine each motion separately, drawing all reasonable inferences and resolving all conflicts in the record in favor of the non-moving party.[106] I may "only grant a

---

[103] *Viacom Int'l, Inc. v. Winshall*, 2012 WL 3249620, at *10 (Del. Ch. Aug. 9, 2012).

[104] *Senior Tour Players 207 Mgmt. Co. LLC v. Golftown 207 Holding Co., LLC*, 853 A.2d 124, 126 (Del. Ch. 2004).

[105] *In re El Paso Pipeline Partners, L.P. Derivative Litig.*, 2014 WL 2768782, at *1 (Del. Ch. June 12, 2014).

[106] *In re Orchard Enterprises, Inc. S'holder Litig.*, 88 A.3d 1, 8 (Del. Ch. 2014) ("When considering the plaintiffs' motion, conflicts in the evidence must be resolved in favor of the defendants, and all reasonable inferences drawn in their favor. When considering the defendants' motion, the opposite is true."); *Fasciana v. Elec. Data Sys. Corp.*, 829 A.2d 160, 166–67 (Del. Ch. 2003).

motion for summary judgment to one of the parties when there is no disputed issue of material fact and that party is entitled to judgment as a matter of law."[107]

## IV. ANALYSIS

The Defendants urge me to conclude that the language of the JV Agreements unambiguously provides for Mills Units as buy/sell consideration, and to hold the parties to that agreement. The Plaintiffs, conversely, urge me to look to extrinsic evidence to fill the gaps in these agreements—namely, to determine the parties' expectations regarding the unavailability of Mills Units due to restructuring, something left unaddressed by those agreements—and to find that Simon Group Units are not only a contractually-compliant substitute, but one to which the Defendants consented.

There are material disputes of facts in the record that, as described below, prevent me from granting summary judgment to either party here.[108] Further, because the scope of these Motions reached beyond the impact of the 2012

---

[107] *Fasciana*, 829 A.2d at 166–67.

[108] *See, e.g.*, *United Rentals, Inc. v. Ram Holdings, Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007) ("When the issue before the Court involves the interpretation of a contract, summary judgment is appropriate only if the contract in question is unambiguous. Therefore, the threshold inquiry when presented with a contract dispute on a motion for summary judgment is whether the contract is ambiguous."); *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232–33 (Del. 1997) ("[W]hen there is uncertainty in the meaning and application of contract language, the reviewing court must consider the evidence offered in order to arrive at a proper interpretation of contractual terms. This task may be accomplished by the summary judgment procedure in certain cases where the moving party's record is not *prima facie* rebutted so as to create issues of material fact. If there are issues of material fact, the trial court must resolve those issues as the trier of fact.").

32

Agreement and Indemnity, and the material differences between Mills Units and Simon Group Units—the only areas into which I allowed discovery pending these motions—it is prudent to allow the development of a more complete record upon which to resolve these important, and heavily disputed, contractual issues.[109]

A. *The Defendants' Motion for Summary Judgment*

The JV Agreements unambiguously provide that the default consideration when exercising the call is Mills Units meeting certain criteria. However, these Agreements do not address the unavailability of Mills Units due to a change in control or restructuring transaction. Accordingly, I cannot conclude from this unambiguous language whether the parties intended the call right[110] to lapse if and

---

[109] At oral argument on the Defendants' Motion for Judgment on the Pleadings, I invited the parties to conduct limited discovery into two issues: first, the impact of the 2012 Agreement and Indemnity on the JV Agreements, if any, and second, whether there are material differences between Mills Units and Simon Group Units. My motivation for doing so was to provide more context for the Defendants' allegations that the Plaintiffs were in breach of these JV Agreements, and for the Plaintiffs' contention that the 2012 Agreement and Indemnity effectively substituted Simon Group Units for Mills Units in the buy/sell provisions in the JV Agreements.

The Defendants assert that the scope of the Plaintiffs' discovery has far exceeded these limited bounds, and that I should deny the Plaintiffs' Motion for Summary Judgment to allow for a more complete record to be developed. The discovery conducted by the Plaintiffs has exceeded this limited discovery, and extends into the background of the JV Agreements at issue. I do not find it appropriate to deny the Plaintiffs' Motion on this basis alone, but rather, based on my determination that a review of extrinsic evidence is proper here, and that the record not only contains material disputes of fact but is also underdeveloped.

Additionally, the Plaintiffs challenge the Defendants' submission of two affidavits and one declaration in conjunction with their Answering Brief. Even assuming that these affidavits and declaration were submitted improperly, the Plaintiffs will now be afforded the opportunity to engage in further discovery, including depositions of these affiants, as appropriate.

[110] The contention is that the call right, but not necessarily the put right, would lapse. This is because under the Buy/Sell provision, if the call right was exercised, the consideration to be paid was Mills Units and Simon Group Units pro rata in proportion to Mills Partnership's and Simon Group's respective interests in the relevant partnership's general partner, *unless* the Kan Am

33

when Mills Units satisfying the contractual criteria became unavailable. Instead, I must resort to extrinsic evidence to determine how the parties intended to proceed in the circumstances in which they now find themselves.[111] Though not fully developed, the record here is not devoid of indications that Kan Am considered Simon Group Units an appropriate substitute for Mills Units, and that it had—prior to its April 26, 2013 letter disavowing any consideration but Mills Units— intimated that Simon Group Units, or at least some form of non-cash consideration, would be contractually compliant.[112] Consequently, I cannot conclude that the Defendants intended *only* to accept Mills Units, and, accordingly, that the call right was meant to lapse when those Units became unavailable. This, among the other issues discussed below, will require further factual development to ascertain the parties' intent.

---

affiliate opted to receive all cash or a combination of cash and Mills Units and Simon Group Units. If, however, a Kan Am entity exercised its put right under the Original JV Agreements, it would receive cash unless the Mills Partnership and Simon Group affiliates elected to pay for its interest entirely in Mills Units and Simon Group Units, in a proportion that Mills Partnership and Simon Group agreed upon, or a combination of cash and an agreed-upon proportion of Mills Units and Simon Group Units. Thus, the put right would not necessarily lapse upon the unavailability of Mills Units, since the default consideration was cash, even if the call right lapsed. *See, e.g.*, Belger Transmittal Aff. Ex. 6 § 11.3(d); *id.* Ex. 7 § 11.6(d); App. to Answer Ex. 6 § 11.3(d); *infra* at 8–9.

[111] *See, e.g.*, *Eagle Indus.*, 702 A.2d at 1233 ("In construing an ambiguous contractual provision, a court may consider evidence of prior agreements and communications of the parties as well as trade usage or course of dealing."); *id.* at 1233 n.10 ("This is true notwithstanding the presence of a routine integration clause . . . .").

[112] This includes the representations that Kan Am made to its investors and distributors; the overtures made by von Boetticher indicating that he wanted to exercise his put right in exchange for Simon Group Units; the execution of the two letters following the execution of the 2012 Agreement and Indemnity contemplating that Simon Group could be an "Offeror;" and, to a much lesser extent, the statements that Kan Am made in its audited financial statements.

34

Further, as the JV Agreements do not address the unavailability of Mills Units, the Plaintiffs' allegation that the Defendants have breached their implied duty of good faith and fair dealing is not precluded by our case law.[113] For those reasons, the Defendants' Motion for Summary Judgment is denied.

B. *The Plaintiffs' Motion for Summary Judgment*

The Plaintiffs point to record evidence to support their motion; nonetheless, I find the record as currently constituted insufficient to demonstrate as a matter of law that the Plaintiffs are entitled to specific performance or damages. "The court's ultimate goal in contract interpretation is to determine the parties' shared intent."[114] Accordingly, "[w]hen the language of a contract is plain and unambiguous, binding effect should be given to its evident meaning,"[115] and the Court should not resort to extrinsic evidence "to vary the terms of the contract or to create an ambiguity."[116] However, where the contract does not address the matter in dispute, the Court may resort to extrinsic evidence to ascertain the parties'

---

[113] *Compare Klig v. Deloitte LLP*, 36 A.3d 785, 797 (Del. Ch. 2011) ("A court will employ the covenant to analyze unanticipated developments or to fill gaps in the contract's provisions." (internal quotation marks omitted)), *with Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010) ("Delaware's implied duty of good faith and fair dealing is not an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, that later adversely affected one party to a contract."), *and Sanders v. Devine*, 1997 WL 599539, at *6 (Del. Ch. Sept. 24, 1997) ("[T]he law is settled that where the terms of a contract expressly address the terms of a dispute, those express contractual terms—not an implied covenant of good faith and fair dealing—govern the parties' relations.").

[114] *Medek v. Medek*, 2009 WL 2005365, at *8 (Del. Ch. July 1, 2009).

[115] *MPT of Hoboken TRS, LLC v. HUMC Holdco, LLC*, 2014 WL 3611674, at *5 (Del. Ch. July 22, 2014) (internal quotation marks omitted).

[116] *In re Explorer Pipeline Co.*, 781 A.2d 705, 713–14 (Del. Ch. 2001) (internal quotation marks omitted).

intent, such as "the overt statements and acts of the parties, the business context, prior dealings between the parties, and other business customs and usage in the industry."[117]

After reviewing the record, I cannot conclude as a matter of law that the parties intended that the units of any operating partnership convertible into publicly traded common stock, or that Simon Group Units specifically, were intended to substitute for or actually replaced Mills Units either initially, upon the 2007 merger and subsequent dissolution of Mills Corp., or upon the restructuring that took place in 2012, leading to the parties' execution of the Agreement and Indemnity.

The record requires factual development in several areas, including (1) the parties' negotiations surrounding entry into the JV Agreements, thus informing me whether the Defendants demonstrated a contractual indifference to the type of partnership units it would receive,[118] (2) Defendants' suggestion of a special

---

[117] *See, e.g.*, *Senior Hous. Capital, LLC v. SHP Senior Hous. Fund, LLC*, 2013 WL 1955012, at *41 (Del. Ch. May 13, 2013) ("The LLC Agreement is silent on this matter, and so it is necessary to look to extrinsic evidence to determine the parties' intent."); *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language.").

[118] *See, e.g.*, Foxworthy Aff ¶ 16 ("Initially during the negotiations of the JV Agreements, Kan Am indicated that it wanted to have the option to elect or receive the Buy/Sell Price entirely in either [Mills Units] or [Simon Group Units]. [Simon, Inc.] was not willing to provide the Buy/Sell price entirely in [Simon Group Units], and as a compromise the parties agreed that in the event of a call Kan Am would receive the Buy/Sell Price in a mix of [Mills Units] and [Simon Group Units], based on [Mills Partnership] and [Simon Group's] relative ownership interests in the general partner of the joint venture, unless Kan Am opted to receive cash.").

relationship between Kan Am and Mills Corp., such that Mills Units are unique,[119] and (3) Defendants' contention that Mills Units had certain tax advantages that may not be realized if the currency is Simon Group units.[120]

The remaining evidence Plaintiffs offer, including an exchange between Braithwaite and Simon in 2002, negotiations regarding the Denver West Agreement after Mills Corp.'s dissolution, the 2012 Agreement and Indemnity, and the Orange City Mills Agreement, is insufficient for me to grant the Plaintiffs summary judgment for the reasons discussed below.

### 1. Braithwaite-Simon Exchange

The Plaintiffs point to an exchange between Braithwaite and Simon in 2002 relating to the buy/sell provisions in the Ontario Mills JV Agreement—an Agreement not at issue here. Though at that time, Simon, a Simon, Inc. executive, communicated his understanding that, upon either Mills Corp. or Simon, Inc.'s exit from the joint venture relationship, the buy/sell consideration for Kan Am's interest would be either operating partnership units of whichever entity remained or cash,[121] Braithwaite did not respond to either confirm or dispute this position. Nonetheless, the Plaintiffs argue that this silence reflects a confirmation, and that

---

[119] *See, e.g.,* Defs.' Opening Br. in Supp. of Mot. for Summ. J. at 24–25; Defs' Reply Br. in Supp. of Mot. for Summ. J. at 14–15.

[120] *See, e.g.,* Defs.' Opening Br. in Supp. of Mot. for Summ. J. 27–34; Defs' Reply Br. in Supp. of Mot. for Summ. J. at 13–14.

[121] Simon Aff. Ex. B; *see also* Simon Aff. ¶ 16.

this exchange demonstrates a mutual understanding "that, following the buyout transaction, the non-cash currency would be the units of whichever of the two operating partnerships remained as Kan Am's partner in the joint venture," not only under the Ontario Mills LP Agreement, but also under the JV Agreements.[122] Kan Am's silence in response to Simon's communication regarding the impending exit of either Mills Corp. or Simon, Inc.—and the impact of that exit on the buy/sell consideration of an agreement not at issue here—does not compel the conclusion as a matter of law that Kan Am was consenting to the substitution, in any JV Agreement and at any time, of Simon Group Units, nor does it resolve the question of the intent of the parties upon entering the JV Agreements.

### 2. Denver West Agreement and Negotiations

The Plaintiffs contend further that, upon Simon, Inc.'s return into the parties' joint venture relationship, and following Mills Corp.'s dissolution in 2007, Kan Am's "explicit position" was "that [Simon Group Units] were the required currency under the Buy/Sell Provisions."[123]  Nevertheless, in negotiating the Denver West Agreement, Simon, Inc. itself did not adopt the position that Simon Group Units were the automatic, or even appropriate, substitute for Mills Units;

---

[122] Pls.' Reply Br. in Supp. of Mot. for Summ. J. at 11–12, 11 n.17.  The Plaintiffs further argue that because Braithwaite did not address this contention until his late-filed affidavit, "[t]he only conclusion that can be drawn is that Kan Am in fact understood and agreed with Simon that the appropriate currency would be either [Simon Group Units] or [Mills Units], depending on which entity was Kan Am's partner." *Id.* at 12.

[123] *Id.* at 3.

instead, Simon, Inc. and Farallon tried to leverage the unavailability of Mills Units to force Kan Am to accept cash as the only buy/sell consideration under that Agreement.[124]

Furthermore, the execution of a Unifying Side Letter in connection with the Denver West project does not demonstrate that Kan Am considered Simon Group Units the automatic replacement for Mills Units following Mills Corp.'s dissolution. The first draft of this Letter proposed by Kan Am reflected its desire "to negotiate in good faith a new valuation for the [Mills Units] that shall entail a conversion into the common stock of the [Simon, Inc.], or an affiliated corporate entity approved by Kan Am."[125] After this language was rejected by Simon, Inc. and Farallon, Kan Am sent a draft that reflected its understanding that there existed a "disagreement as to the form of the non-cash consideration under [the buy/sell provision] of the Denver West Agreement *as well as the Limited Partnership Agreements*, *i.e.*, whether the units are to be units of [Simon Group] instead of units of [Mills Partnership] as a result of the acquisition of [Mills Corp.]"[126] While absent from the executed version of this Letter, this language prevents me from concluding, at the summary judgment stage and based on an incomplete record,

---

[124] In fact, Simon, Inc. used the unavailability of Mills Units as leverage on at least one other occasion, in connection with the refinancing of the Grapevine Mills LP. *See* Hammond Aff. ¶¶ 32–33; *id.* Ex. E at KANAM_00015631–32, 34–35.

[125] Hammond Aff. Ex. B. at KANAM_00021887 § 1(G); *see also id.* ¶ 26.

[126] *Id.* Ex. C at KANAM_00017559 (emphasis added); *see also id.* ¶ 27.

that Kan Am believed that Simon Group Units were the automatic successor to Mills Units; that it believed a negotiation of its rights unnecessary; or that it was waiving its right to negotiate an appropriate non-cash buy/sell consideration at a future time. Rather than indicating an automatic substitution of Simon Group Units for Mills Units, the executed Unifying Side Letter suggests that further negotiations to determine the appropriate buy/sell provisions to replace Mills Units were contemplated.[127]

Far from demonstrating that Kan Am "confirmed following the 2007 Mills merger that [Simon Group Units] were the required non-cash currency and the currency that Kan Am wanted to receive in exchange for its interests,"[128] the Denver West negotiations demonstrate that, following the 2007 merger, the parties understood that Mills Units satisfying the criteria of the buy/sell provisions were unavailable; that the parties disagreed as to the appropriate substitute; and that at least Kan Am contemplated some form of negotiation regarding an appropriate substitute. While it is true that Simon Group Units were "the only non-cash currency that could have been considered at that time," as Farallon was a private company, the parties specifically deferred a determination that Simon Group Units

---

[127] The executed Unifying Side Letter provides that "*if the parties agree, or it is later determined*, that non-cash consideration may be paid under the payment provisions of [the buy/sell provision] of the [Colorado Agreement], then [the buy/sell provision] of the [Denver West Agreement] shall also be modified to reflect such payment provisions." Quinn Transmittal Aff. Ex. 2 at 9 (emphasis added).

[128] Pls.' Reply Br. in Supp. of Mot. for Summ. J. at 7.

should be substituted for Mills Units. Based upon the evidence currently of record, neither party, during the Denver West negotiation, evidenced a sufficiently clear belief that Simon Group Units were contractually equivalent to Mills Units under the JV Agreements at issue here, to allow me to find, as a matter of law, that the Plaintiffs are entitled to a judgment.

### 3. 2012 Agreement and Indemnity

I find that the 2012 Agreement and Indemnity does not unambiguously substitute Simon Group Units for Mills Units as buy/sell consideration in the JV Agreements.[129] That Agreement provides that the Kan Am entities

> agree that any of [the Simon Group]-affiliated entities which are the transferees upon the Closing of the Transaction *will be admitted as partners and/or members*, as the case may be, of the applicable entities which own any of the [Simon Group]/Kan Am Properties, *without any further act or agreement required.*[130]

From this language, the Plaintiffs argue that the Defendants consented to Simon Group as "the agreed-upon successor to [Mills Partnership] in each of the JV

---

[129] From 2007 to 2012, Farallon was involved in this joint venture relationship with Simon, Inc. and Kan Am. Though Simon Group Units convertible into publicly traded Simon, Inc. common stock were available during this period, Farallon was a private entity for which this feature was unavailable. Thus, from 2007 to 2012, it is not clear how the buy/sell provision would have operated, and what consideration would have been appropriate. To the extent that the Plaintiffs argue that the 2012 Agreement and Indemnity not only substituted Simon Group Units for Mills Units, but was also responsible for reinvigorating the structure of the call rights that existed prior to Farallon's involvement in the joint venture relationship, I find such an argument unavailing. This does not mean that the buy/sell rights ceased to exist in 2007, only that a more detailed record is necessary to determine the appropriate operation of the buy/sell provisions now that Mills Units are unavailable.

[130] Quinn Transmittal Aff. Ex. 21 § 1(b) (emphasis added).

41

Limited Partnerships."[131]  As noted by the Plaintiffs, all JV Agreements provide that they are "binding upon and shall inure to the benefit of the parties hereto and their respective . . . successors, and permitted assigns," which, the Plaintiffs aver, following the 2012 Agreement and Indemnity, includes Simon Group.[132]  As a corollary, the Plaintiffs argue, Simon Group inures to all Mills Partnership rights, including the right to buy out Defendants in its own units, Simon Group Units.

I do not find the Plaintiffs' interpretation of the 2012 Agreement and Indemnity to be the only reasonable interpretation of the document.  I note that this Agreement does not explicitly reference the buy/sell provisions within the JV Agreements, and that its purpose was to provide indemnification to the Kan Am entities in exchange for their consent to the 2012 restructuring.  To the extent I may resort to extrinsic evidence to determine the parties' intent in the 2012 Agreement and Indemnity, the record before me is insufficient to demonstrate that the parties intended that Agreement to have any effect on the buy/sell provisions of the JV Agreements.

The Plaintiffs, notably, have not introduced into the record any contemporaneous evidence indicating that either party contemplated that this Agreement would have any impact on the buy/sell provisions, much less work a

---

[131] Pls.' Reply Br. in Supp. of Mot. for Summ. J at 22.
[132] *See, e.g.*, Quinn Transmittal Aff. Ex. 5 § 14.10; Pls.' Reply Br. in Supp. of Mot. for Summ. J at 22.

substitute of Simon Group Units for Mills Units.[133]  Instead, the Plaintiffs rely on

their contention that they have introduced into the record

> uncontradicted evidence that at all relevant times—from when the Buy/Sell Provisions were first negotiated in the 1990s through the execution of the Agreement and Indemnity in 2012—Kan Am understood and agreed that the Buy/Sell Price would be payable in operating partnership units of whichever of [Mills Partnership] or [Simon Group] was Kan Am's partner at the time of a Buy/Sell transaction,[134]

and urge me, in light of that background, to find that Kan Am consented in the

Agreement and Indemnity to Simon Group and Simon Group Units replacing Mills

Partnership and Mills Units in the JV Agreements.  I have already found this

background less clear than do the Plaintiffs.  Considering the competing inferences

derived from the limited extrinsic evidence I have before me, I cannot conclude as

a matter of law that the intent or effect of the 2012 Agreement and Indemnity was

to substitute Simon Group Units for Mills Units in the JV Agreements at issue

here.

### 4. Orange City Agreement

Lastly, the Plaintiffs contend that the language of the Orange City

Agreement "reflects the understanding that, if [Mills Partnership] was no longer

---

[133] *See, e.g.*, Quinn Transmittal Aff. Ex. 2 at 11 (admitting, without waiving their objections, that they never "stated to anyone on the Kan Am Entities' behalf, orally or in writing, that an intended purpose or effect of the Agreement and Indemnity was to modify the stated currency in the Buy/Sell provisions of the JV Agreements and/or permit the substitution of [Simon Group Units] for [Mills Units]").

[134] Pls.' Answering Br. in Opp'n to Defs.' Mot. for Summ. J. at 20–21.

Kan Am's partner in that joint venture, Kan Am would receive operating partnership units of [Mills Partnership's] successor."[135]  Section 11.2(a) of that Agreement provides that Mills Partnership, "for purposes of . . . [the buy/sell provisions,] shall be deemed to include [Orange City Mills Mezzanine II GP, LLC] and any other Mills Partners,"[136] with the term "Mills Partners" being defined as "[c]ollectively, [Mills Partnership] and [Orange City Mills Mezzanine II GP, LLC] and their respective Affiliates, successors and/or assigns who or which become Partners *in accordance with this Agreement*."[137]  Thus, the Plaintiffs argue that:

> By defining the term "[Mills Partnership]" as used in the Buy/Sell Provisions to include [Mills Partnership's] successors and assigns, the Orange City Mills Agreement contemplates that [Mills Partnership's] successors would be able to exercise the call right and deliver the Buy/Sell Price in *its* operating partnership units.  The fact that these provisions were included in the only JV Agreement executed after Simon sold its interests in 2002 is further evidence that the parties did not intend, and the JV Agreements do not provide that, the acquisition of [Mills Corp.] would eliminate the call right.[138]

The Orange City Agreement may be evidence of the parties' intent in entering the JV Agreements, but in light of the ambiguities in the record, at this stage I cannot find that it demonstrates, as a matter of law, that the parties' intent in

---

[135] *Id.* at 24.
[136] Quinn Transmittal Aff. Ex. 16 § 11.2(a).
[137] *Id.* § 1.38 (emphasis added); *see also id.* at § 1.2 (defining Affiliate, "[w]ith respect to any Person, a Person who, directly or indirectly, controls, is under common control with, or is controlled by, that Person," with control meaning "the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person.").
[138] Pls.' Answering Br. in Opp'n to Defs.' Mot. for Summ. J. at 24 (emphasis added).

the JV Agreements was that successor's units were contractually equivalent to Mills Units.

—

For these reasons, I cannot conclude as a matter of law that the parties intended to substitute or did in fact replace Mills Units with Simon Group Units in the buy/sell provisions of the JV Agreements, either initially, at the time of the 2007 merger, when Simon, Inc. bought out Farallon in 2012, or when the parties executed the 2012 Agreement and Indemnity. Additionally, the Plaintiffs argue that the Defendants waived any right they may have had to insist on Mills Units as the sole buy/sell consideration. I cannot find, on the limited record here, that the Defendants have waived their rights to insist on Mills Units as the sole consideration in the event of a call by entering the Orange City Mills Agreement, or otherwise.[139] For the foregoing reasons, the Plaintiffs' Motion for Summary Judgment is denied.

C. *Remaining Issues*

Having determined that I cannot, at this juncture, conclude as a matter of law that the parties intended to provide and accept only Mills Units, I find it premature

---

[139] *See, e.g.*, *Dervaes v. H.W. Booker Constr. Co.*, 1980 WL 333053, at *8 (Del. Super. 1980) ("Where the evidence concerning waiver, or an element or requisite thereof is disputed, or where more than one reasonable inference may be drawn from the evidence, the issue is generally held to be a factual question inappropriate for summary adjudication."); *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 445 (Del. 2005) ("intention to waive must appear clear from the record evidence before summary judgment is granted on this issue").

to address whether the Plaintiffs were in breach of the JV Agreements. Similarly, consideration of the timeliness of the call notice provided under the Concord Mills Agreement is premature, and should await my decision, post-trial, of whether the Defendants contracted for Simon Group Units as a form of buy/sell consideration.

In light of the complexity of the significant factual development still required, I find it appropriate and desirable to develop the facts more thoroughly at trial.[140]

## V. CONCLUSION

For the foregoing reasons, I deny the parties' Cross-Motions. An appropriate Order accompanies this Memorandum Opinion.

---

[140] *See e.g., Alexander Industries, Inc. v. Hill,* 211 A.2d 917, 918–19 (Del. 1965); *Ebersole v. Lowengrub,* 180 A.2d 467, 468–69 (Del. 1962); *Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 1998 WL 731660 at *3 (Del. Ch. Oct. 9, 1998); *Cont'l Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1227–28 (Del. Ch. 2000); *In re Orchard Enterprises, Inc. Stockholder Litig.*, 88 A.3d 1, 16 (Del. Ch. 2014).